# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-0835V
UNPUBLISHED

| | |
|---|---|
| ANITA GROSS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: March 11, 2021<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Lost Wages; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS) |

*Randall G. Knutson*, Knutson & Casey Law Firm, Mankato, MN, for Petitioner.

*Mollie Danielle Gorney*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On June 6, 2019, Anita Gross filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered Guillain-Barré syndrome ("GBS") caused-in-fact by the influenza ("flu") vaccine she received on October 25, 2017. Petition at 1, ¶¶ 2, 12. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. After Respondent conceded entitlement, the parties were unable to resolve damages on their own, so the disputed damages components were addressed at the February 2021 SPU Motions Day.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$166,189.85, representing $160,000.00 for her past pain and suffering, $798.75 for past lost wages, and $5,391.10 for past out-of-pocket expenses.**

I. **Relevant Procedural History**

Approximately one year after the Petition was filed in this case, Respondent filed a Rule 4(c) Report conceding that Petitioner's injury met the Table definition for GBS following receipt of the seasonal flu vaccine. ECF No. 21; *see* 42 C.F.R. § 100.3(a) XIV.D. (2017) (definition of a Table GBS). I issued a Ruling on Entitlement on May 13, 2020. ECF No. 22. The parties thereafter made some efforts to settle damages but were unsuccessful. Both sides eventually agreed to my proposal that they participate in an expedited hearing, completing damages briefing by September 29, 2020. ECF No. 36 (joint status report); ECF Nos. 31-34 (parties' briefs and additional evidence). The expedited hearing was held on February 26, 2021,[3] and at its conclusion I orally informed the parties of my determination.
.

II. **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for

---

[3] The expedited hearing in this case was originally scheduled for January 15, 2021. EF No. 37. Due to the past and expected violence in Washington, DC and inaccessibility of the building until January 22, 2021, the expedited hearing was rescheduled for February 26, 2021. *See* Informal Remark and Non-pdf Pre-Hearing Order, issued Jan. 13, 2021. An official recording of the proceeding was taken by court reporter, and a link to instructions on the court's website detailing how to order a certified transcript or audio recording of the proceeding can be found in the minute entries for this proceeding. Minute Entry, dated February 26, 2021; *see also* www.uscfc.uscourts.gov/trans (last visited June 1, 2020).

emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III. The Parties' Arguments

In her damages brief, Petitioner requested at least $180,000.00 for her past and future pain and suffering,[5] $228,212.70 for her past and future lost wages, and $5,391.10 for her out-of-pocket expenses. Petitioner's Memorandum for Damages Decision ("Brief") at 19, ECF No. 32. At the February 26, 2021 expedited hearing, however, Petitioner's counsel indicated that Petitioner was withdrawing her request for $226,342.30 in past and future lost wages, representing her annual salary for the five years following her January 2020 retirement.[6] Thus, Petitioner now seeks only $1,870.40 in past lost wages, which is the gross amount for two weeks of leave taken during her illness. Of these 80 hours,

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] Petitioner did not specify the portion of this amount which would be attributed to her future pain and suffering. Any amount awarded for future pain and suffering must be reduced to its net present value. Section 12(f)(4)(A).

[6] Petitioner asserted that, because of her GBS, she "was forced to retire at 65 instead of 70 as originally planned." Brief at 10. Petitioner was born on February 28, 1954. Exhibit 1.

Petitioner was reimbursed for 74 hours as paid time off pursuant to an employer policy ("PTO"). Brief at 13. Petitioner asserts she should be compensated for her PTO, as well as her unpaid leave, because but for her GBS, unused PTO time would have been reimbursed to her upon departure from her position (given that her employer treated sick leave and vacation time indistinguishably). *Id.*

To support the amount requested for her pain and suffering, Petitioner compared the circumstances in her case to those in three other published Program decisions addressing pain and suffering in comparable circumstances: *Fedewa*, *Johnson,* and *Dillenbeck*.[7] Asserting that the severity and duration of her pain and suffering was at least that suffered by those petitioners, she maintains that her award should be more than $180,000.00, the maximum awarded for past pain and suffering in those cases.

Respondent countered that Petitioner should receive a more modest sum - $82,500.00, for pain and suffering,[8] $109.59 for the six hours of unpaid leave she took, and the full amount of $5,391.10 she seeks for her past out-of-pocket expenses. Respondent's Brief on Damages ("Opp.") at 1, 13, ECF No. 34. To support this lower amount for pain and suffering, Respondent stressed the short duration of Petitioner's hospitalization, the fact that she declined physical therapy ("PT") thereafter, and the gap in treatment from July 2018 (nine months after vaccination) until seen again by her primary care provider ("PCP") almost two years later. *Id.* at 11-12. Respondent also pointed to differences between the facts and circumstances in Petitioner's case and those suffered by the petitioners in *Johnson*, *Fedewa*, and *Dillenbeck. Id.* at 12, 12 n.7.

Respondent further argued that the symptoms suffered by Petitioner more than nine months after her vaccination were attributable to her co-morbid diabetic neuropathy rather than her GBS. Res. Brief at 11. To support this position, Respondent referenced a July 2018 entry setting out that opinion from the second neurologist who treated Petitioner, Dr. Cutsforth-Gregory. *Id.* In contrast, Petitioner maintained that her later symptoms were the result of her GBS. Pet. Brief at 1. She relies on the opinion of her PCP, Dr. Megard, provided in May 2020. *Id.* at 1-2.

---

[7] *Fedewa v. Sec'y of Health & Human Servs.,* No.17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020) (awarding $180,000.00 for past pain and suffering); *Johnson v. Sec'y of Health & Human Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for actual pain and suffering); *Dillenbeck v. Sec'y of Health & Human Servs.,* No. 17-0428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (a decision I issued awarding $170,000.00 for past pain and suffering and $10,857.15, the net present value of payments of $5,000.00 per year for 22 years).

[8] Like Petitioner, Respondent does not distinguish between past and future amounts. *See supra* note 5.

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents and at the expedited hearing held on February 26, 2021. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases.[9] However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner's GBS was quickly diagnosed, after emergency room ("ER") visits on November 6 and 7, 2017. Exhibit 4. Following her second ER trip, she was transferred to Sanford Medical Center and underwent an EMG, lumbar puncture, and a five-day course of IVIG without complication. *See, e.g.*, Exhibit 5 at 24-25, 33-34, 40, 49. She was still experiencing symptoms, however, and her Gabapentin dose was increased at her discharge one week later. *Id.* at 20. At a follow-up appointment with her PCP on November 21, 2017, it was noted that Petitioner had difficulty walking upstairs. Exhibit 6 at 24. However, she declined to attend the prescribed PT because her symptoms were improving. *Id.*

In early 2018, Petitioner was seen twice by her neurologist, Dr. Mamah. At these visits, she described some tingling and numbness in her legs and difficulty with balance which was lessened by the Gabapentin she was taking. Exhibit 12 at 14, 81. She was still experiencing numbness around her rectum but described it as improved since her hospitalization. *Id.* at 14, 81. These symptoms were not as severe as those Petitioner now alleges. In her damages brief, Petitioner maintained that "[s]he can no longer sit, stand, or walk without being in immense pain." Brief at 14. She described a constant state of unbalance, issues with incontinence and an inability to sleep or drive. *Id.*; *see also* Petitioner's Second Affidavit[10] at ¶¶ 4-17, filed Aug. 27, 2020, ECF No. 33. In her second affidavit executed on August 25, 2020, Petitioner alleged "a feeling of electric shocks

---

[9] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through January 1, 2021 reveals the median amount awarded to be $167,499.14. These awards have typically ranged from $128,072.42 to $269,933.00, representing cases between the first and third quartiles.

[10] Petitioner filed a total of three affidavits. In the first and third affidavits, she addressed the basic requirements of the Vaccine Act and details regarding her employment and PTO, respectively. Exhibits 2, 18. This second affidavit was not assigned an exhibit number.

5

through my feet." Petitioner's Second Affidavit at ¶ 5. There is nothing in Petitioner's medical records to support these later assertions of more severe symptoms, however.

Additionally, a second EMG performed on February 18, 2018 showed no evidence of large-fiber neuropathy but indicated that the EMG "assess[ed] only large myelinated fibers, and a pure small-fiber polyneuropathy cannot be ruled out." Exhibit 12 at 84; *see* Exhibit 7 at 13-24 (specific results). These results also showed "evidence for demyelinating involvement of motor fibers in the peripheral nerves." Exhibit 12 at 84. Thus, it is unclear whether the symptoms Petitioner exhibited in spring 2018 were due to her GBS or possibly related to her diabetes. Medical records from prior to vaccination reflected Petitioner's difficulty controlling her diabetes, and Petitioner's blood sugar levels were noted to be high during her hospitalization. Exhibit 5 at 704; Exhibit 9 at 31, 43.

In the summer of 2018, Petitioner sought a second opinion from neurologist Dr. Cutsforth-Gregory. An EMG performed on July 10, 2018, showed negative results like those obtained in February of that same year. Exhibit 8 at 48. A thermoregulatory sweat test performed the same day, however, provided support for small-fiber neuropathy. *Id.* at 45. In correspondence sent to Petitioner later in July 2018, Dr. Cutsforth-Gregory opined that, due to her uncontrolled diabetes, Petitioner most likely had asymptomatic diabetic neuropathy prior to GBS, but which manifested symptomatically after the "second hit" of GBS. *Id.* at 92. He concluded, however, that "her ongoing symptoms are more likely due to diabetic neuropathy." *Id.* (all capitals in the original).

Petitioner received no treatment for her symptoms during the remainder of 2018 and 2019. She continued to work without interruption until her retirement in January 2020. When seen by her PCP, Dr. Megard, again on May 15, 2020, Petitioner had received no treatment for almost two years. Because the medical record from this visit contains scant information, it is difficult to ascertain Petitioner's condition at that time. *See* Exhibit 13 at 2.

A few days later Dr. Megard provided a letter, upon which Petitioner relies, stating his strong opinion that Petitioner's symptoms were due to her GBS and not diabetic neuropathy. Exhibit 13 at 1. He based his opinion on Petitioner's lack of symptoms prior to vaccination, the sudden onset of her neuropathy, and lack of change in her symptoms with improved diabetic control. *Id.* Dr. Megard prescribed PT, but it appears Petitioner attended only one session, on August 12, 2020. Exhibit 15. In his letter, Dr. Megard addresses the symptoms Petitioner experienced after vaccination in their totality, opining that all were related to her GBS. He does not differentiate between the symptoms she experienced in the fall of 2017 and those she experienced later, however, nor does he address the results of the two EMGs and Thermoregulatory sweat test performed in 2018.

Based upon the record as a whole, I find that the severity and duration of Petitioner's GBS symptoms warrant a significant pain and suffering award, but not quite at the level requested by Petitioner. The record establishes that her treatment and symptoms course did not rise to the level of what the petitioners in the three cited cases experienced. For example, although the *Johnson* petitioner endured a five-day hospitalization with an uncomplicated treatment similar to that experienced by Petitioner, that individual was later unable to return to work, even on a limited basis, until almost three months after her discharge. *Johnson,* 2018 WL 5024012, at *3. And more than three months after her hospitalization, the *Johnson* petitioner was working only half days, three times a week. *Id.* at *4. Also unable to drive or work for three months following his illness, the *Fedewa* petitioner experienced a hospitalization which was longer in duration and involved difficulties related to his lumbar puncture, IV drip, and EMG. *Fedewa*, 2020 WL 1915138, at *2. Following her hospitalization, the *Dillenbeck* petitioner attended PT for more than a month. *Dillenbeck*, 2019 WL 4072069, at *2. Furthermore, the *Dillenbeck* petitioner's termination from a job she enjoyed was found to be partially attributed to her GBS. *Id.* at *12-13.

I also do not give the same weight to the opinion of Dr. Megard that Petitioner urges. Although I credit Petitioner's argument that as her PCP, Dr. Megard would have increased familiarity with her overall health, I note that his opinion was provided 30 months after Petitioner's hospitalization and almost two years since he last treated Petitioner's symptoms. Additionally, this later visit with Dr. Megard occurred almost one year after Petitioner filed her vaccine case and simultaneously with my ruling finding Petitioner entitled to compensation.

Dr. Cutsforth-Gregory, by contrast, has provided a somewhat more reliable treater evaluation of Petitioner's overall condition. Dr. Cutsforth-Gregory does not dispute that Petitioner had GBS after receiving a flu vaccine in October 2017, or that a portion of her ongoing symptoms could be attributed to that illness. But he observes that Petitioner simultaneously experienced diabetic neuropathy, previously asymptomatic, with the majority of her symptoms in 2018 and later. Dr. Cutsforth-Gregory also provided this treatment-oriented opinion in July 2018, after reviewing Petitioner's current test results and thus not with any eye toward litigation. Additionally, as a neurologist Dr. Cutsforth-Gregory possesses additional expertise which strengthens the persuasive value of his assessment, over the opinion provided by Dr. Megard.

As I explained previously to the parties during the expedited hearing, it is my view that GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically-alarming injury, such as SIRVA. Thus, Petitioner's pain and suffering award should be greater than the $82,500.00 proposed by Respondent. Weighing all of the above, I deem an award of $160,000.00 to

be fair and reasonable.

## V. Appropriate Compensation for Petitioner's for Lost Wages

Respondent agrees that Petitioner should be compensated for the six hours of unpaid leave she used during her illness, but opposes any award for the 74 additional hours of PTO. Opp. at 1, 9, 13. In his damages brief, Respondent argued that, because her employer already paid her for this time, Petitioner would receive compensation twice if this amount is included in the damages awarded in this case. *Id.* at 8-9. To support the argument that she be compensated for the full 80 hours of leave, Petitioner provided a third affidavit asserting that she would have received the cash value of this time when she later retired, plus a document suggesting that her employer allows employees to accumulate leave for a period of 20 years. Exhibit 18 at 6-7; Exhibit 20 at 1.

During the expedited hearing, Respondent's counsel also argued that it would be speculative to award any compensation for this time because there was no way to guarantee that Petitioner would not have used this time for illness or vacation prior to her retirement. She also asked that I reduce the amount requested to its net present value if I decided to award any portion of the amount requested for Petitioner's PTO. The $109.59 Respondent proposed for Petitioner's six hours of unpaid leave has been reduced to reflect the actual amount Petitioner would receive (after taxes and other withholding). Petitioner's counsel stressed that, in non-vaccine cases, injured parties are routinely paid the value of any missed work.

As I informed the parties during the expedited hearing, there is little discussion of this issue in prior vaccine cases. I did determine that in a fairly old case, former Special Master Hastings had included the value of a petitioner's sick leave and vacation days when calculating the amount of lost wages to be awarded. *See Davies v. Sec'y of Health & Human Servs.*, 92-0800V (Fed. Cl. Spec. Mstr. Jan. 14, 1994). There, it appears to have been determined that the petitioner had established that she would be allowed to carryover this time, and thus would have received a cash award for unused time when she terminated her employment.[11]

On this matter, both sides have made reasonable points. Respondent correctly observes that it is speculative to assume Petitioner might not have needed to use the time she took while absent due to GBS, for vacation or some other illness. But Petitioner also has offered *some* credible evidence that her employer likely would reimburse unused

---

[11] As I informed the parties during the expedited hearing, however, because the decision was issued more than 25 years ago, a full copy of it was never posted to the Court's website, and it otherwise cannot be found on any legal services website.

sick/vacation time, and *Davies* suggests that this kind of time lost due to a vaccine-caused injury is reimbursable as damages in a Program case. Putting all of the above together, I find that it is reasonable to award Petitioner one-half of the PTO she expended during her illness. The parties have agreed that $798.75 is a reasonable estimate of the net present value of the 37 hours of PTO plus hours of unpaid leave I am awarding. *See* Informal Remark, dated Mar. 11, 2021 (regarding March 5, 2021 email exchange). I will incorporate that sum in the final damages total amount.

## VI. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $160,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[12] I do not find that an award for future pain and suffering is warranted in this case. I also find Petitioner entitled to compensation in the amount of (a) $798.75, reflecting the net amount of the six hours of unpaid leave and one-half of the other PTO expended by Petitioner, and (b) the amount of expenses agreed upon by the parties, $5,391.10.**

**I therefore award Petitioner a lump sum payment of $166,189.85, representing $160,000.00 for her actual pain and suffering, $798.75 for her actual lost wages, and $5,391.10 for her actual expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[13]

**IT IS SO ORDERED.**

             <u>s/Brian H. Corcoran</u>
             Brian H. Corcoran
             Chief Special Master

---

[12] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.